LARRY A. RATAJ,

              Plaintiff,                Case No. 07-10565

vs.                            DISTRICT JUDGE LAWRENCE P. ZATKOFF
                            MAGISTRATE JUDGE STEVEN D. PEPE

MICHAEL J. ASTRUE,
Commissioner of Social Security,

              Defendant.
==========================/

## REPORT AND RECOMMENDATION

## I.      BACKGROUND

Larry Rataj brought this action under 42 U.S.C. § 405(g) and § 1383 for judicial review of the Commissioner's final decision denying his application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act and Supplemental Security Income (SSI) under Title XVI of the Social Security Act. Both parties have filed motions for summary Judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED IN PART** and Defendant's Motion for Summary Judgment be **DENIED**, and that this case be **REMANDED** for further proceedings consistent with this decision.

### A.     Procedural History

In a April 28, 1999, decision, Plaintiff was found to be disabled as of February 28, 1997 due to degenerative disc disease of his lumbar spine (R. 28-31). On December 1, 2003, it was found that Plaintiff was no longer disabled as of November 1, 2003 (R. 37-39). Plaintiff

requested reconsideration, at which the cessation decision was upheld. At Plaintiff's request, an administrative hearing was held on June 16, 2006, at which Plaintiff testified and was represented by counsel (R. 232). Vocational Expert ("VE") Pauline Pegram also testified. On August 16, 2006, Administrative Law Judge ("ALJ") Wilenkin issued his decision finding that Plaintiff was not disabled as of November 1, 2003, because his condition had improved such that he was capable of performing a limited but significant number of sedentary level jobs (R. 12-19). The Appeals Council denied Plaintiff's request for review on January 11, 2007 (R. 4-6).

**B.**   **Background Facts**

*1.*   ***Plaintiff's Testimony and Statements***

Plaintiff was 45 years old at the time of the ALJ's decision; he was a younger individual at all times relevant to his claim (R. 14, 235). He has a high school education and completed additional course work in graphic design as late as 2002 (R. 15, 235-36). Plaintiff worked in the past as a machinist, die maker and mold maker (R. 15, 236). He testified that he was no longer able to work due to back pain that radiates down both of his legs, numbness and weakness in his right leg and foot, and depression (R. 237, 239, 241, 244).

(a)   Plaintiff's Reports

On June 19, 2003, Plaintiff reported that he woke up with spasms and cramps in both legs (R. 77). He had problems putting on socks, shoes and pants (R. 78, 104). Plaintiff swam every morning for therapy, but reported that he could not sit or stand for an extended period of time or engage in any prolonged activities (R. 77).

On February 4, 2004, Plaintiff reported that his condition had not improved (R. 94). He continued to take Vicodin, Neurontin, Mobic and Flexeril (R. 95, 100). He needed to lie down during the day due to pain (R. 97). Plaintiff indicated that he had one back surgery after he was

2

awarded disability benefits. He had no improvement after the surgery (R. 99).

On February 15, 2004, Plaintiff continued to report pain and difficulty getting out of bed in the morning (R. 103). Plaintiff had difficulty bending to put on clothing, experienced numbness in his legs and had less motor control in his right leg (R. 104). Plaintiff could stand for 30 minutes, sit approximately one hour and walk 1/4 mile (R. 107).

On June 1, 2006, Plaintiff reported that he could stand 5-10 minutes, sit 15 minutes, walk 100 yards and lift a gallon of milk. He did not sleep through the night and laid down during the day (R. 131).

        (b)     <u>Plaintiff's Testimony</u>

On June 16, 2006, Plaintiff testified that he had undergone four back surgeries. The last surgery was in 2000. After that, Plaintiff tried Chinese energetic medicine (R. 237). He continued to have back pain with weakness in the right leg (R. 239). The back pain radiated to both legs (R. 239-240). He sometimes got numbness in his right foot (R. 241). He underwent facet injections with Dr. Dobritt (R. 241-242). He also underwent radiofrequency cauterization of the nerves (R. 242).

Plaintiff swam daily for exercise, but indicated that he had not had any type of formal physical therapy for several years (R. 243). He took 50 milligrams of Methadone and approximately three Loricet a day for pain. While Plaintiff stated the medication took the "edge off," he reported that it also made him feel drowsy and that once a day every other day he took a an hour and a half to two hour nap (R. 251). He also sat in a recliner with his feet elevated about 6 hours per day (R. 252). Plaintiff testified that no further surgeries had been recommended (R. 243-244). He did not use any type of assistive device (i.e., a cane or crutch) to help him walk (R. 244).

The ALJ asked Plaintiff if he had any other problems [in addition to his back and leg]. Plaintiff responded that he suffered from depression, with significant effects. He saw psychologist Dr. Ianni approximately once a month or once every two months for treatment (R. 244-245). Plaintiff confirmed that he would not be depressed and would work if he did not have pain.

Plaintiff did not sleep through the night, often waking two or three times due to pain (R. 246). His pain was aggravated by movement, sneezing or coughing.

Plaintiff was able to perform light household activities including cooking, vacuuming, laundry, and dusting at a slow pace. It was estimated that he could walk one quarter mile, stand for one hour, sit for one to two hours and lift ten pounds (R 247-50). He had two roommates who did any yard work (R. 247). Plaintiff was not able to touch his toes, but had no difficulty using his arms and hands (R. 250). He described lying down for one to two hours every other day (R. 251).

## 2. *Medical Evidence*

Plaintiff was found disabled as of 1997 due to degenerative disc disease of his lumbar spine and his multiple surgeries. Plaintiff underwent lumbar laminectomies in 1996, spinal fusion in 1998, and revision surgery in 2000.

In June 2000, Plaintiff's treating surgeon, Miles L. Singer, D.O., P.L.L.C., provided a short history of Plaintiff's surgical procedures and indicated that he had undergone three previous lumbar laminectomies (R. 196). Dr. Singer noted that Plaintiff had made some moderate improvement after each surgery, but within six to ten months had recurrence of disc herniation and low back pain. Plaintiff reported pain in the back and right leg, and indicated that

the pain was interfering with his activities of daily living. A MRI revealed additional disc extrusion and scar tissue formation. Plaintiff elected to undergo revision surgery.

In January 2001, Dr. Singer described Plaintiff as making slow but steady progress following his most recent surgery (R. 190). Two months later, in March 2001, Dr. Singer released Plaintiff to return to primarily sedentary work that allowed him to alternate between sitting and standing, and that allowed him to avoid bending, lifting and twisting (R. 187). In February 2002, Dr. Singer described Plaintiff's lumbar fusion as healed (R. 186). Dr. Singer reported minimal clinical evidence of impairment in 2002 through 2003 (R. 182-84). Straight leg raising was negative bilaterally, and sensation, strength and reflexes were intact. In June 2004, Dr. Singer described Plaintiff as completely disabled, stating that his prior report from October 2003 had contained typographical errors (R. 180-81).

In October 2003, E. Montasir, M.D., examined Plaintiff, and noted that although Plaintiff limped and exhibited muscle spasm in his lumbar spine, neurological examination yielded normal results (R. 156-59). Dr. Montasir also noted that Plaintiff had osteoarthritis of the spine, and had undergone several surgeries consisting of discectomy, fusion and removal of scaring (R. 159). This resulted in weakness causing him to have a significant antalgic gait affecting most of his activities. Plaintiff could not stay in one position for very long, about 10 to 15 minutes, without feeling numbness, paresthesias or pain.

State agency physician, William K. Joh, M.D., reviewed the medical evidence of record in November 2003, and concluded that "marked physical improvement had occurred since" Plaintiff was found to be disabled, and that he was capable of performing limited ranges of light-level work (R. 135-42). Similarly, a May 2004 evaluation by a state agency physician

found that Plaintiff could perform light work, involving prolonged standing or walking and lifting 20 pounds (R. 145).

In January 2005 pain specialist Dennis W. Dobritt, D.O., D.A.B.P.M., D.A.A.P.M., F.I.P.P., described Plaintiff's mood, affect, and thought processes as normal (R. 203). Dr. Dobritt observed that Plaintiff had been depressed in the past to the point of having suicidal thoughts, but not currently (R. 204). His pain ranging from 6-10 of 10 made him irritable and he is "negative about everything." It interrupts his sleep and by the end of the day "he cannot think straight because of the pain" (R. 202). He gave Plaintiff a Lidocaine injection and noted that he was not a candidate for further surgery (R. 204). He referred Plaintiff to Dr. Peter Ianni, their pain psychologist for evaluation and treatment. He again saw Plaintiff February 10 at which time his pain was 5 of 10 (R. 201). He gave Plaintiff another Lidocaine injection. On March 28, 2005, Dr. Dobritt performed neurolytic radiofrequency lesioning ("RF") on his back (R. 199). In May 2005 Dr. Dobritt's treatment notes reflect that Plaintiff was alert and oriented, and exhibited appropriate affect (R. 197). He was 3 of 10 and came for another RF treatment (R. 199). Plaintiff had failed to see Dr. Ianni, noting that Plaintiff did not believe in psychologists. Dr. Dobritt opined that Plaintiff "seemed to be fixated on" the fact that Dr. Pierce had reduced his medications. He observed that Plaintiff did not appear to be "particularly interested in pursuing" alternative therapies (R. 197-98). Dr. Dobritt again referred Plaintiff to Dr. Ianni, their pain psychologist, and Dr. McCarroll, their addictionologist (R. 197). He required Plaintiff see these colleagues before continuing him on pain management involving drugs.

Treatment notes from Plaintiff's primary care physician B. McCarroll, D.O., dated June 17, 2005, November 18, 2005 and December 16, 2005, indicate that Plaintiff's back pain was increasing (R. 214, 216, 224). Yet, in August 2005, Dr. McCarroll observed that Plaintiff's pain

was a lot better, and reported normal results upon neurological testing (R. 222). Dr. McCarroll's treatment records overall reflect that Plaintiff's subjective "pain score" decreased, reflecting continued improvement through April 2006 (R. 205-22).

Psychologist Peter Ianni, Ph.D., performed an initial examination of Plaintiff in May 2006.[1] He noted Plaintiff was in moderate distress with pain averaging 5-6 and rising to 8 or 9. When it gets bad he feels suicidal. Test showed a moderate degree of depression and suicide risk Plaintiff was frustrated by his inability to work. Dr. Ianni diagnosed him as exhibiting severe major depression secondary to back pain (R. 230–31). Plaintiff was given a GAF of 40.[2] Dr. Ianni opined that Plaintiff did not pose a significant addiction risk (R. 231). Dr. Ianni indicated he would be providing bi-monthly individual psychotherapy treatment with an emphasis on behavioral pain management.

### 3. *Vocational Evidence*

VE Pauline Pegram testified that Plaintiff's past work in mold making, dye making and as a machinist would be characterized as "at least high level semi-skilled" and at the medium

---

[1] It is likely that this initial interview for Dr. Dobritt was May 27, 2005, not 2006, or shortly after the March 2005 referral from Dr. Dobritt. The text of the "May 27,2006" letter refers to a "May 27, 2005" intake session which was likely the date the letter was written. The ALJ or drafter had written " ? 5" next to the "2006" date on the letter.

[2] The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32. A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *Id.* A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *Id.* A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.*

exertional level (R. 254). Plaintiff did not acquire any skills from these jobs that were transferable to sedentary work. Yet, the VE indicated that Plaintiff did complete two certifications in CAD CAM, which allow for occupations performed at the sedentary exertional level.

ALJ Wilenkin asked VE Pegram whether an individual of Plaintiff's age, education, and work experience could perform any of his past relevant jobs or any other work that exists in the state or the metropolitan Detroit area assuming that his descriptions of his limitations were taken as accurate (R. 255). VE Pegram responded that Plaintiff would not be able to perform any work on a competitive basis. She indicated that preclusive factors would include Plaintiff's need to pace himself and his need to miss work possibly every other day due to pain (R. 255-256).

The ALJ then asked VE Pegram whether an individual of Plaintiff's age, education, and work experience could perform any jobs if that individual was limited to sitting six of eight hours of an eight hour work day, standing or walking two of eight hours in an eight hour work day, lifting no more than 10 pounds occasionally and lesser weight frequently (R. 256). ALJ Wilenkin asked VE Pegram to assume a well established history of significant lower back pathology necessitating no less than four surgical interventions, as well as the presence of continuing radiculopathy and ongoing low back pain. Yet, while ALJ Wilenkin indicated that VE Pegram may assume Plaintiff's symptoms related to this pathology are ever present, she should not consider them to be present with "sufficient severity, intensity or frequency" to interfere with or otherwise preclude functioning at the level he suggests. Activities requiring excessive twisting or movement of the torso throughout the extreme range of motion would be contraindicated, as would activities requiring use of the upper extremities above shoulder level.

In addition to those limitations, the individual should be allowed to alternate between standing, sitting and moving at his option (R. 257). He also should not be required to perform vocational activities wherein the pace of the work's productivity is dictated by some external force, such as an assembly line or conveyer belt, but is able to work at his own pace. The VE could assume that there was a certain element of reactive depression and long-term presence and perception of discomfort in the lower back, but that this individual would be able to understand, remember and follow instructions, complete assigned tasks in a timely and appropriate fashion, respond appropriately to customary work pressures, supervisors and other personnel (R. 258). Finally, the ALJ asked the VE to assume that the deficits suffered and/or the modalities employed to treat the same do not warrant mandatory daily recumbency of any sort.

The VE testified that such an individual could not perform Plaintiff's past relevant work nor "strictly technically" the jobs to which Plaintiff had recently obtained training, i.e. the CAD CAM certifications. Yet, there were other jobs that fit the parameters of the ALJ's hypothetical, including 12,000 jobs at the sedentary level and 10,000 unskilled "industrial manufacturing type occupations" in the state of Michigan (R. 258-259).

Plaintiff's attorney then asked VE Pegram what effect the need to be recumbent as much as six hours per day as indicated by Plaintiff would have on the identified jobs (R. 259). VE Pegram responded that such a restriction would preclude competitive employment.

### 4.      *ALJ Wilenkin's Decision*

ALJ Wilenkin noted that Plaintiff was found disabled in an April 28, 1999, decision, known as the comparison point decision ("CPD") (R. 14). At the time of the CPD, Plaintiff had the following medical determinable impairment: degenerative disc disease of the lumbar spine necessitating multiple surgeries. ALJ Wilenkin opined that the medical evidence did not

establish that Plaintiff developed any additional impairments after the CPD through November 1, 2003, the date Plaintiff's disability was terminated. The ALJ incorrectly noted that Plaintiff's impairment was found by the ALJ in the April 28, 1999, decision to result in the residual functional capacity to perform sedentary work.[3]

The ALJ found that Plaintiff had not engaged in substantial gainful activity relevant to his decision through November 1, 2003. He also found that Plaintiff's impairment was a "severe" impairment within the meaning of the Regulations, and that Plaintiff was unable to perform his past relevant work (R. 17). Yet, the ALJ opined that Plaintiff's impairment was not "severe" enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, or Regulations No. 4 (R. 14). In addition, ALJ Wilenkin determined medical improvement occurred as of November 1, 2003, and that this resulted in an ability to work due to an increase in Plaintiff's residual functional capacity (R. 17).

ALJ Wilenkin found Plaintiff's testimony not fully credible to the extent he alleged he was unable to perform limited ranges of sedentary work (R. 15-16). He noted that the medical evidence failed to document an ongoing back impairment that would preclude the Plaintiff from performing the sedentary work described by the vocational expert. While Plaintiff had undergone lumbar laminectomies in 1996, spinal fusion in 1998 and revision surgery in 2000, he had not required any additional surgery. The ALJ specifically noted that Plaintiff's treating physician, Dr. Singer, reported as of February 2002 that Plaintiff's clinical findings included only minor discomfort of the back with nearly resolved peroneal weakness, normal ambulation without assistive devices, and only minor weakness of the right foot (R. 16).

---

[3] The CPD and prior ALJ found that Plaintiff had the residual functional capacity to perform **less than** sedentary work (R. 30).

Dr. Singer did conclude as of June 2004 that Plaintiff was completely disabled, stating that his prior report dated October 2003 had typographical errors. Yet, ALJ Wilenkin found it "very odd" that Dr. Singer clearly indicated in October 2003 that Plaintiff only had mild findings at best with respect to the back and that he reported more severe findings when seen in June 2004. The ALJ opined that there was no indication "at all" of any worsening of Plaintiff's condition from October to June that might warrant the more severe clinical defects, and therefore the ALJ Wilenkin concluded that Dr. Singer may have merely been trying to support a conclusion of disabled.

ALJ Wilenkin stated that the only exhibit of record including the diagnosis of severe major depression is a report from a consultative psychologist, Dr. Ianni, who examined the Plaintiff in May 2006 (2005?, see footnote 1) (R. 15). While the doctor concluded Plaintiff had severe major depression secondary to back pain to the extent that he only had a GAF score of 40, none of the other reports of record during the relevant period indicate any cognitive limitations. It was noted by Dr. Dobritt, who saw Plaintiff in January 2005, that Plaintiff's mood, affect and thought processes were normal. The doctor's records also indicate that Plaintiff was alert and oriented, with an appropriate effect, when seen in May 2005. Moreover, Dr. Dobritt indicated as of 2005 that Plaintiff had depression in the past but not currently.[4]

The ALJ found Plaintiff could perform sedentary work which did not require prolonged walking, climbing stairs or ladders, excessive twisting or torquing of the torso, use of the upper extremities above shoulder level, repetitive stooping, squatting, or kneeling, any crouching, crawling, balancing, or bending to the floor, that allowed him to change positions between sitting, standing, and moving about at his own option, did not involve productivity dictated by an

---

[4] This entry is ambiguous on whether Plaintiff was depressed but not currently suicidal or currently not depressed and not suicidal (R. 204).

external source like an assembly line or conveyor belt, and allowed Plaintiff to work at his own pace, although he could tolerate the demands of a daily production requirement (R. 18).

The ALJ noted that the VE indicated in response to his hypothetical that such an individual could perform sedentary work of attendant, clerk, badge checker, systems monitor, sorter, packager, inspector and assembler with 11,000 such jobs in existence in the regional economy and 22,000 in the State. Based on the testimony of the VE, the ALJ found that as of November 1, 2003, Plaintiff was capable of making a successful adjustment to work that existed in significant numbers in the national economy (R. 18-19). Accordingly, ALJ Wilenkin concluded Plaintiff was not disabled (R. 19).

## II.    ANALYSIS

### A.    Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Brown*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her

past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects. A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform. *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

To determine whether disability ceased, the fact finder must compare the medical evidence supporting the most recent final decision holding that the claimant is disabled with medical evidence of the claimant's condition after the date of that decision. *Vaughn v. Heckler*, 727 F.2d 1040, 1043 (11th Cir.1984). This comparison point is called the comparison point decision date ("CPD"). 20 C.F.R. § 404.1594(b)(7); 20 C.F.R. § 416.994(b)(1)(C)(vii). Medical improvement is assessed by review of "symptoms, signs and laboratory findings." 20 C.F.R. § 416.994(b)(1)(I); 20 C.F.R. § 404.1594(b)(1). Symptoms are the claimant's description of impairments. 20 C.F.R. § 416.928; 20 C.F.R. § 404.1528. Signs are observable by medically acceptable clinical diagnostic techniques. *Id.* Laboratory findings are from medically acceptable laboratory techniques. *Id.*

Specifically, 20 C.F.R. § 404.1594(b)(7) states:

(7) Point of comparison. For purposes of determining whether medical improvement has occurred, we will compare the current medical severity of that impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled to the medical severity of that impairment(s) at that time. If medical improvement has occurred, we will compare your current functional capacity to do basic work activities (i.e., your residual functional capacity) based on this previously existing impairment(s) with your prior residual functional capacity in order to determine whether the medical improvement is related to your ability to do work. The most recent favorable medical decision is the latest decision involving a consideration of the medical evidence and the issue of whether you were disabled or continued to be disabled which became final.

Even if Defendant is correct that the ALJ reasonably considered all relevant evidence concerning Plaintiff's mental and emotional state, and substantial evidence supported his decision that Plaintiff had exhibited medical improvement, that determination of medical improvement is only the first step of a two step process proscribed by the regulations. 20 C.F.R. § 404.1594(b)(7) clearly states that "if medical improvement has occurred, we will compare your current functional capacity to do basic work activities (i.e., your residual functional capacity) based on this previously existing impairment(s) with your prior residual functional capacity in order to determine whether the medical improvement is related to your ability to do work." Moreover, 20 C.F.R. § 404.1594(c)(3)(ii) indicates that "there will be no attempt made to

reassess the prior residual functional capacity."[5]  Thus, an ALJ cannot say the prior RFC was too generous to the Plaintiff.

### B.    Factual Analysis

Plaintiff raises three challenges to the Commissioner's decision: (1) the ALJ's decision contains factual errors; (2) the ALJ failed to provide sufficient reasons for rejecting the opinion of the treating psychologist Dr. Ianni and; (3) the ALJ erred in finding Plaintiff not fully credible.

#### 1.    Factual Errors

Plaintiff contends the ALJ's decision contains factual errors.  Specifically, he argues that the ALJ erred in finding that at the time of the comparison point decision ("CPD") Plaintiff had been found capable of sedentary-level work (Dkt. #8, p. 8).  Plaintiff further contends the ALJ erred in finding that Plaintiff had not developed any additional impairments since his initial award of benefits; when in fact he had developed depression since that time (Dkt. #8, pp. 9-10).

---

[5] The prior residual functional capacity is so important to a continuing review assessment that the regulations require that a previous residual functional capacity be "reconstruct[ed]" where it is missing from the claimant's file or because it was not done.  20 C.F.R. § 404.1594(c)(3)(iii) states:

> (iii) Prior residual functional capacity assessment should have been made, but was not. If the most recent favorable medical decision should have contained an assessment of your residual functional capacity (i.e., your impairments did not meet or equal the level of severity contemplated by the Listing of Impairments in appendix 1 of this subpart) but does not, either because this assessment is missing from your file or because it was not done, we will reconstruct the residual functional capacity. This reconstructed residual functional capacity will accurately and objectively assess your functional capacity to do basic work activities. We will assign the maximum functional capacity consistent with an allowance.

Plaintiff also avers the ALJ's decision contains contradictory language as to whether or not his back impairment would likely preclude the performance of sedentary work. (Dkt. #8, p. 11).[6]

Defendant acknowledges that Plaintiff had been found incapable of even sedentary work at the time he was found to be disabled, and that the 1999 decision awarding him benefits did not describe him as experiencing depression. Yet, Defendant argues that the ALJ clearly set forth the degree of limitation he believed reasonably resulted from Plaintiff's underlying impairments. Defendant submits that any error by the ALJ in these respects is harmless, however, because the ALJ reasonably considered all relevant evidence concerning Plaintiff's mental and emotional state, and substantial evidence supported his decision that Plaintiff had exhibited medical improvement since he had been found disabled.

Here, as Defendant concedes, ALJ Wilenkin misstated Plaintiff's prior RFC, and incorrectly found that Plaintiff had not developed any additional impairments since his initial award of benefits. While the prior ALJ found that Plaintiff was capable of **less than** sedentary work (R. 30), ALJ Wilenkin found that the previous ALJ stated Plaintiff was capable of sedentary work (R. 14). While ALJ Wilenkin found that Plaintiff suffered from depression and that Plaintiff had not developed any additional impairments since his initial award of benefits, the 1999 CPD did not describe Plaintiff as experiencing depression. Moreover, there is nothing in ALJ Wilenkin's decision to suggest that these were mere typographical errors in his 2006 decision and that he was accurately comparing the prior ALJ's findings with his own, as is required by the regulations. To the contrary, his decision misstates the previous ALJ's findings

_____

[6] The current ALJ's decision contains contradictions. The ALJ's decision states: "Indeed, the record does indicate an ongoing back problem **that would likely preclude** the claimant from performing any exertional activities on a regular basis since the comparison point decision finding the claimant disabled, dated April 28, 1999." (Emphasis added, R. 15). Later, the ALJ stated that the medical evidence fails to document an ongoing back impairment that would preclude the performance of sedentary work (R. 16).

and at one point even appears to agree with the prior decision's holding, stating: "indeed, the record does indicate an ongoing back problem that would likely preclude the claimant from performing any exertional activities on a regular basis since the comparison point decision finding the claimant disabled, dated April 28, 1999." (Emphasis added, R. 15).  This statement constitutes a  substantial inconsistency.  Moreover, the indication that the 1999 CPD involved depression and an ability to perform sedentary work are significant errors.

### 2. *Proper Use of Plaintiff's Psychologist's Opinion*

Plaintiff contends the ALJ failed to provide sufficient reasons for rejecting the opinion of the treating psychologist Dr. Ianni. (Dkt. #8, pp. 12-14).  20 C.F.R. § 404.1502 defines a treating physician as "your own physician . . . who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."  A treating physician's opinion should be given greater weight than those of consultative physicians who are hired for the purpose of litigation and who examine the claimant only once.  See 20 C.F.R. § 404.1527(d)(5) (specialist's opinion generally given more weight if opinion concerns medical issues related to the area of specialty).

Although "in determining whether a claimant is entitled to disability insurance payments, medical opinions and diagnoses of treating physicians are entitled to great weight, and if uncontradicted, are entitled to complete deference", *id.*, such opinions regarding disability are not conclusive.  *Houston v. Sec'y of HHS*, 736 F.2d 365, 367 (6th Cir. 1984).  *See also* 20 C.F.R. § 404.1527(e)(3) ("We will not give any special significance to the source of an opinion on an issue reserved to the Commissioner").  Rather, the ultimate decision of disability rests with the ALJ, not the treating physician, *id.*, and the Commissioner is "not bound  by the opinion of a treating physician where there is substantial evidence to the contrary." *Loy v. Sec'y of HHS*, 901

F.2d 1306, 1308 (6th Cir. 1990) (citing *Lashley v. Sec'y of HHS*, 823 F.2d 922, 927 (6th Cir. 1987)).

As an initial matter, the record does not establish that Dr. Ianni was a treating medical source, at least at the time he authored the report in question. The only report of Dr. Ianni's in the record documents his initial examination of Plaintiff, dated May 2006 (sic)(2005?) (R. 230).[7] If the 2005 date is accurate, Dr. Ianni at his intake interview was not familiar with Plaintiff's condition over time, so that his opinion would be due the deference generally afforded treating physicians. *See, e.g. Turpin v. Bowen*, 813 F.2d 165, 170 (8th Cir. 1987) ("the report of a consulting physician who examine[s a] claimant once does not constitute 'substantial evidence' upon the record as a whole especially when contradicted by the evaluation of the claimant's treating physician." *Piercy v. Bowen*, 835 F.2d 190, 191 (8th Cir. 1987)).

Yet, a written report of a consultant physician who has examined the applicant can constitute substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 402 (1971); *Babineaux v. Heckler*, 743 F.2d 1065, 1068 (5th Cir. 1984); *Williams v. Shalala*, 997 F.2d 1494, 1499 (D.C. Cir. 1993). "Plus" factors that will bolster a consulting examiner's opinion are (1) consistency with other evidence of functional capacity, (2) detailed evaluations, (3) clinical and laboratory findings where the applicant's treating physician has no similar medical evidence or (4) relevant area of speciality. Courts have accorded greater weight to a consulting specialist over a treating physician if new information or perspectives are provided by the consultant's expertise and

---

[7] This 2006 date appears to be a typographical error (R. 230). Dr. Dobritt made the referral on May 23, 2005 (R. 197). The text of Dr. Ianni's "May 27,2006" letter refers to a "May 27, 2005" intake session which was likely the date the letter was written. The ALJ or drafter had written " ? 5" next to the "2006" date on the letter.

18

impartiality in comparing one case to another. *Reynolds v. Bowen*, 844 F.2d 451, 454-55 (7th Cir. 1988).

As noted above, due to a discrepancy in dates, it is not clear whether Dr. Ianni was a treating or consulting physician. The only report of Dr. Ianni's in the record documents his initial examination of Plaintiff, dated May 2006 (R. 230), but in that report Dr. Ianni indicates that he is "currently providing bi-monthly individual psychotherapy treatment."

In addition, 20 C.F.R. §404.1520a requires that the ALJ follow a special technique when assessing the severity of a claimant's mental impairments. Specifically, the ALJ must evaluate the degree of functional loss – using the five-point scale: none, mild, moderate, marked, and extreme – in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §404.1520a(c)(3). The ALJ must take into account:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

SSR 85-16.

20 C.F.R. §§404.1520a(c)(1) requires consideration of "all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment". In addition, 20 C.F.R. § 404.1520a(c)(2) requires that the decision maker consider the extent to which the mental impairment interferes with an "ability to function independently, appropriately, effectively, and on a sustained basis" including "such

factors as the quality and level of [ ] overall functional performance, any episodic limitations [and] the amount of supervision or assistance [ ] require[d]."

Much of this analysis was formerly done in a Psychiatric Review Technique Form ("PRTF"). Prior to October 2000, the PRTF was completed at the state agency level and a form was completed by the ALJ and attached to the decision. SSA revised its regulation in September 2000 and modified 20 C.F.R. §404.1520a(e)(2) to no longer require the ALJ to complete and attach a Psychiatric Revew Technique Form (" PRTF"). But in place of this the ALJ now must document the application of this §404.1520a(c) technique on the four functional areas in the written decision.

> [T]he written decision issued by the administrative law judge or Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). *The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.*")

*Id.* at § 404.1520a(e)(2) (Emphasis Supplied).

While ALJ Wilenkin appears to have touched on some of these areas, noting Plaintiff had good concentration, memory, responsiveness and a pleasant demeanor, he failed to engage in a thorough review of all the relevant categories, as required by the regulations (R. 15).[8] Were this the only error, it would not warrant a remand. But other errors do warrant a remand. Thus, on remand the ALJ can determine if Plaintiff has a mental condition warranting the findings under

---

[8] The ALJ noted that no other evidence of record describes Plaintiff as experiencing any limitations resulting from mental or emotional impairments (R. 15). To the contrary, pain specialist Dr. Dobritt, who Plaintiff met with on several occasions, described Plaintiff's mood, affect, and thought processes as normal (R. 197, 203). Yet, Dr. Dobritt indicated that Plaintiff had experienced depression and suicidal ideation in the past, but not at the time Dr. Dobritt treated him (R. 204). In addition, while Plaintiff claimed to be depressed, he also indicated that fact alone would not prevent him from working (R. 245).

20 C.F.R. §404.1520a(c). Further, the ALJ can resolve the ambiguity regarding the date(s) on which Plaintiff saw Dr. Ianni. The resolution of that ambiguity will help to determine whether Dr. Ianni should be viewed as a consulting or treating physician, and the appropriate weight that should therefore be given to his opinion.

### 3. *Plaintiff's Credibility*

Plaintiff contends the ALJ erred in finding him not fully credible by considering his activities as evidence and by implying that Plaintiff lacked motivation to pursue alternative treatment modalities (Dkt. #8, pp. 14-19). In determining the existence of substantial evidence, it is not the function of a federal court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In *Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 476 (6th Cir. 2003), the Court noted that an ALJ can reject a claimant's credibility on pain and other symptoms, and exclude these from the hypothetical question to the VE, if the ALJ's reasons are adequately explained.

In reaching his conclusion regarding Plaintiff's credibility, the ALJ indicated that he considered appropriate factors including the objective medical evidence, medical opinion evidence, Plaintiff's treatment, his medications and his activities. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Therefore, Administrative Law Judges are required to consider Plaintiff's activities as one of the several relevant factors in assessing his credibility. 20 C.F.R. §§ 404.1529(c)(3)(I), 416.929(c)(3)(I).

The ALJ's decision indicates that Plaintiff testified that he did some housework at a slow pace, including vacuuming, laundry, cooking and dusting (R. 15). Plaintiff also reported that he cooked a few times a week and usually took rest periods. Cooking caused an increase in his pain

level (R. 78).  Plaintiff submits that his daily activities do not negate his testimony about pain and limitations, and that it is well established that a plaintiff need not be completely helpless or bedridden to qualify for Social Security disability benefits.  The Sixth Circuit has noted that a claimant's ability to perform simple functions such as driving, grocery shopping, dish washing and floor sweeping does not necessarily indicate an ability to perform substantial gainful activity.  *Walston v Gardner*, 381 F2d 580, 585-586 (6th Cir. 1987); *Polly v Gardner*, 364 F2d 969, 974 (6th Cir. 1966).[9]

Here, however, the ALJ's analysis went beyond a review of Plaintiff's activities and included a discussion of the medical record, which normally could support the ALJ's determination regarding Plaintiff's credibility.  Yet, the ALJ's decision contains contradictory statements regarding that record, which calls into serious question his review of the medical evidence.  As noted above, while the ALJ stated in one section of his decision that the medical evidence failed to document an ongoing back impairment that would preclude Plaintiff from performing the sedentary work described by the vocational expert, he also indicated that "indeed, the record does indicate an ongoing back problem that would likely preclude the claimant from performing any exertional activities on any regular basis since the comparison point decision finding the claimant disabled, dated April 28, 1999." (R. 15).

Also, the record also does not clearly support the ALJ's conclusion that Plaintiff was opposed to pursuing any alternative therapies.  While Dr. Dobritt indicated that Plaintiff was not "particularly interested" in pursuing "interventional (sic) therapies" (R. 197-198), the record also

---

[9] In *Clifford v Apfel*, 227 F3d 863, 872 (7th Cir. 2000), the Court noted that minimal daily activities does not establish that a person is capable of engaging in substantial physical activity. *See Zurawski v. Halter*, 245 F3d 881, 887 (7th Cir. 2001), the Court noted that the plaintiff's activities were fairly restricted (e.g., washing dishes, helping his children prepare for school, doing laundry and preparing dinner) were not of the sort that necessarily undermines or contradicts a claim of disabling pain.

contains evidence that Plaintiff tried a number of alternative treatments. For example, Plaintiff swam daily at his doctors suggestion (R. 80, 83). He also tried Chinese energenic medicine due to muscle spasm and cramping (R. 83). In addition, Plaintiff had undergone physical therapy, TENS unit (R. 204), spinal injections, sauna heat (R. 202), radiofrequency rhizotomy (R. 199), and taken various narcotic medications.

Further, in support of his decision to discredit Plaintiff's testimony, the ALJ also stated that "while Plaintiff had undergone lumbar laminectomies in 1996, spinal fusion in 1998 and revision surgery in 2000, he had not required any additional surgery." (R. 16). While the ALJ appears to be making the implication that Plaintiff has now recovered from his prior surgeries, a review of the record does not support this finding. In response to the ALJ's question regarding the possibility of additional surgeries, Plaintiff specifically stated: "I'm about out of that avenue. Every surgery that you have they say your chances decline 20 percent. I had four . . ." (R. 243). Plaintiff had undergone 4 surgeries (R. 80) including laminectomies, spinal fusion and revision surgery. Dr. Dobritt noted without question that Plaintiff was not a candidate for further surgery (R. 204). Moreover, in June 2000, Dr. Singer noted that Plaintiff had made some moderate improvement after each surgery, but within six to ten months had recurrence of disc herniation and low back pain (R. 196). Therefore, it is not apparent why the ALJ would have used the fact that an additional surgery was not a suggested solution for Plaintiff to discredit his credibility. In the absence of evidence that another surgery would alleviate Plaintiff's back impairment, four surgeries are enough to demonstrate that Plaintiff has intractable back pain.

In *Davis v. Apfel*, 133 F. Supp. 2d 542, 547 (E.D. Mich. 2001), this Court held that "[t]he reviewing court must affirm the Commissioner's findings if they are supported by substantial evidence and the Commissioner employed the proper legal standard." *Id*. The

court cautioned, however, that "a substantiality of evidence evaluation does not permit a selective reading of the record." *Id.* Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Id.*; *Laskowski v. Apfel*, 100 F. Supp. 2d 474, 482 (E.D. Mich. 2000). *See also Cotter v. Harris*, 642 F.2d 700, 706 (3rd Cir. 1981) ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record"); *Kent v. Schweiker*, 710 F.2d 110, 114 (3rd Cir. 1983) ("Nor is evidence substantial if it is overwhelmed by other evidence..."); *Hamlin*, 365 F.3d at 1224, quoting *Musgrave v. Sullivan*, 966 F.2d 1371,1374 (10th Cir. 1992)(evidence of non-disability cannot be considered "substantial" if it is "overwhelmed by other evidence in the record").

In this case, ALJ Wilenkin has made a number of factual errors in his decision, which cast doubt on whether he properly weighed all medical evidence and the Plaintiff's RFC with the prior ALJ's findings, as is required by the regulations. Moreover, contradictory statements in the ALJ's opinion, including an apparent conclusion of disability, create a substantial inconsistency, thereby seriously weakening his decision to discredit Plaintiff's credibility. Finally, while discounted by the ALJ's analysis, the record also contains the opinions of two treating physicians, Dr. Dobritt and Dr. Singer, both indicating that Plaintiff is completely disabled (R. 181, 204).

*Wilson v. Commissioner of Social Sec.*, 378 F.3d 541 (6th Cir. 2004), involved insufficient justifications given by the ALJ to discount a treating physician. It urges remand in most cases even where there is sufficient evidence in the record to uphold the ALJ decision and even when a different outcome on remand is unlikely:

> [A] procedural error is not made harmless simply because [the aggrieved party] appears to have had little chance of success on the merits anyway." *Mazaleski v. Treusdell*, 562 F.2d 701, 719 n. 41; *see also Ingalls Shipbuilding, Inc. v. Dir., Office of Workers' Comp. Programs*, 102 F.3d 1385, 1390 (5th Cir.1996). To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with § 1527(d)(2), would afford the Commissioner the ability the violate the regulation with impunity and render the protections promised therein illusory.

*Wilson*, 378 F.3d at 546 (selected citations omitted). Here, clear procedural errors under 20 C.F.R. 404.1594(b) occurred and *Wilson* requires that this case be remanded to address and rectify those errors.

*Faucher v. Sec'y of HHS*, 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994), held that after finding reversible error it is appropriate for this Court to remand for an award of benefits only when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Faucher* citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

In this case "all essential factual issues" have been not been resolved with regard to the impact of Plaintiff's prior RFC and his new limitation, depression. Nor is this a case where "proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." Accordingly, a remand for further administrative proceedings consistent with this Report and Recommendation is necessary.

## III.    RECOMMENDATION

For the reasons indicated above, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED IN PART** and Defendant's Motion for Summary Judgment be **DENIED**, and that this case be **REMANDED** for further proceedings consistent with this decision.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local, 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: February 29, 2008                          s/ Steven D. Pepe
Ann Arbor, MI                                      United States Magistrate Judge

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing ***Report and Recommendation*** was served on the

attorneys and/or parties of record by electronic means or U.S. Mail on February 29, 2008.


s/ Alissa Greer
Case Manager to Magistrate
Judge Steven D. Pepe
(734) 741-2298